SAMANTHA BENNETT (NYBN 5132063)
EVAN ROSE (CABN 253478)
ALYSSA J. WU (CABN 339651)
Federal Trade Commission
Western Region San Francisco
90 Seventh St., Suite 14-300
San Francisco, CA 94103
Phone: (415) 848-5100
Email: sbennett@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>        v.<br><br>JUSTANSWER LLC, an Idaho limited liability company; and<br><br>ANDREW "ANDY" KURTZIG, individually and as an officer of JUSTANSWER LLC,<br><br>    Defendants. | Case No. 3:26-cv-00333-JD<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.      The FTC brings this action for Defendants' violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 et seq.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief, pursuant to Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

## SUMMARY OF THE CASE

2.      Defendant JustAnswer LLC ("JustAnswer") operates an online question-and-answer service that connects consumers with experts in a wide variety of subjects whose credentials have been verified by JustAnswer ("Experts").  Defendant Andrew "Andy" Kurtzig ("Kurtzig") is CEO of JustAnswer.  He has been directly involved in the JustAnswer business practices described below.

3.      Defendants deceive consumers into enrolling in a monthly recurring subscription by claiming that consumers can "join" JustAnswer and get access to Experts for a nominal fee (either $1 or $5, depending on the advertisement).  In reality, consumers cannot join JustAnswer for $1 or $5.  After consumers enter their credit card information to pay the nominal "join" fee, Defendants simultaneously charge them a subscription fee that has ranged between $28 and $125.  Defendants then continue to charge the subscription fee every month until the consumer cancels their subscription.

4.      While Defendants provide limited information about the required monthly subscription on their website, Defendants do not present it clearly and conspicuously.  As a result, hundreds of thousands of consumers have provided their credit card information to Defendants without affirmatively consenting to enroll in an ongoing monthly subscription and pay the monthly fee.

5.      In fact, between February 2020 and July 2024, Defendants received more than 679,000 complaints directly from consumers who said they were unaware that they had signed up for a recurring membership.  In other words, for more than four years, an average of 12,500 consumers *every month* reported directly to Defendants that they did not know Defendants had enrolled them in a recurring subscription.

6.      Defendants' employees have repeatedly expressed concerns within the company that the company's purchase flow is misleading consumers.  For example, a customer service supervisor wrote to a subordinate, when discussing how to respond to complaining consumers, "because the majority of our complaints are related to membership charge confusion [we know] that our current sign up flow is misleading."

COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF
Case No. 3:26-cv-00333-JD

7. Even though Defendants know their practices cause rampant consumer injury, they continue to falsely represent to consumers that they can join JustAnswer for just the cost of the $1 or $5 join fee.

### JURISDICTION

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355 because this case is brought by an agency of the United States for claims arising under federal laws regulating commerce and seeks the recovery or enforcement of a penalty.

### VENUE

9. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 1395(a), and 15 U.S.C. § 53(b).

### DIVISIONAL ASSIGNMENT

10. Pursuant to Rule 3-2(c) of the Civil Local Rules of the Northern District of California, there is a sufficient basis for assigning this action to the San Francisco Division or the Oakland Division. A substantial part of the events giving rise to the claims occurred in San Francisco County and Marin County. *See* Civ. L.R. 3-2(d). Until at least July 2023, Defendant JustAnswer LLC's headquarters and principal place of business was located in San Francisco County, and Defendant Andrew Kurtzig resides in Marin County.

### PLAINTIFF

11. The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401–8405, which prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements for disclosure, consent, and cancellation. A negative option is an offer in which the seller treats a consumer's silence— *i.e.*, their failure to reject an offer or cancel an agreement—as consent to be charged for goods and services. 16 C.F.R. § 310.2(w).

COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF
Case No. <u>3:26-cv-00333-JD</u>

-3-

## DEFENDANTS

### A. Corporate Defendant

12.     Defendant JustAnswer LLC is an Idaho limited liability company.  At all times material to this Complaint until at least July 2023, JustAnswer's headquarters and principal place of business was located at 38 Keyes Avenue, Suite 150, San Francisco, California.  JustAnswer now operates virtually in the United States but lists its principal place of business as 440 North Barranca Avenue, #7508, Covina, California.

13.     At all times relevant to this Complaint, acting alone or in concert with others, JustAnswer has advertised, marketed, distributed, or sold its online question-and-answer service to consumers in this District and throughout the United States.

### B. Individual Defendant

14.     Defendant Andrew Kurtzig is the founder and Chief Executive Officer of Defendant JustAnswer.  Kurtzig resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

15.     At all times relevant to this Complaint, acting alone or in concert with others, Kurtzig has formulated, directed, controlled, had authority to control, or participated in the acts and practices of JustAnswer, including the acts and practices described in this Complaint.

16.     Kurtzig has directly participated in the unlawful acts and practices set forth in this Complaint including, among other things: (a) reviewing, approving, or declining proposed changes to the content of the JustAnswer website, including all text related to the descriptions and cost of the service; (b) requesting and reviewing website tests relating to cost representations and fee disclosures; and (c) reviewing employee feedback and reports on consumer complaints.

17.     Kurtzig knows, and has known at all times relevant to this Complaint, that JustAnswer's fee representations are misleading and that consumers have been harmed as a result.  Among other things: (a) Kurtzig reviewed multiple presentations and communications from JustAnswer employees noting that "price transparency" was a major concern and that a significant number of consumers complained that they did not know that the company would

COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF
Case No. 3:26-cv-00333-JD
-4-

charge them a monthly subscription fee; (b) Kurtzig ordered website tests of JustAnswer's purchase flow, which revealed that consumers did not understand that JustAnswer would enroll them in a recurring subscription plan or that the company would charge them a monthly subscription fee at sign-up, in addition to the $1 or $5 join fee consumers were told to pay to receive an answer to their question; (c) in July 2022, Kurtzig personally requested that employees review JustAnswer's purchase flow from a consumer's perspective, to which a customer service supervisor responded that the "join for only $1" claim was misleading; (d) Kurtzig personally received emails from consumers stating that JustAnswer had tricked them into signing up for a membership after believing they would only pay a one-time fee of $1 or $5; and (e) Kurtzig received and reviewed internal memoranda, emails, and oral communications describing consumers' payment confusion.

## COMMERCE

18.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### A. JustAnswer Surreptitiously Enrolls Consumers in a Paid Monthly Subscription to Use Its Question-and-Answer Service

19.    Defendant JustAnswer operates an online platform that offers consumers the opportunity to ask questions and receive answers from Experts in various subject areas through online chats or phone calls.  The allegations below describe the company's business practices from at least January 1, 2022.

20.    Throughout the relevant time period, the vast majority of consumers have joined the JustAnswer question-and-answer service via a three-step search ad purchase flow.  First, they click on a JustAnswer search engine ad related to the topic of their question.  Second, they are taken to a landing page specific to their search topic on JustAnswer.com or one of hundreds of additional domains owned by JustAnswer (e.g., AskAVeterinarianOnline.com,

AskWomensHealth.com, AskALawyerOnCall.com, and Pearl.com). Third, they are taken to the JustAnswer payment form where they enter their payment information.

21. Consumers also may sign up directly on the JustAnswer.com homepage, rather than a JustAnswer.com landing page, or in the JustAnswer mobile app, but those consumers are an exceedingly small minority. Indeed, as of spring 2023, 99% of JustAnswer's customers signed up after clicking on a search ad and being taken to a JustAnswer.com landing page. The small number of consumers who begin at the JustAnswer.com homepage or mobile app are routed to a different purchase flow than those who click on a search ad.

22. Through its search ad purchase flow, JustAnswer misleads consumers about the cost to join JustAnswer's question-and-answer service and omits material information about the recurring subscription. The following subsections address each step of the search ad purchase flow in turn. Complaint Attachments A through J are representative of what a consumer would have seen in the search ad purchase flow since at least January 1, 2022.

### 1. Search Ads

23. Consumers searching for answers to a question online may come across a JustAnswer search ad related to the topic of their question. For example, when searching for "ask a vet online" on Google.com, a consumer might find a sponsored ad for JustAnswer's veterinarian Experts on the search results page. *See* Figs. A and B below. JustAnswer does not disclose its fee structure or required monthly subscription in its search advertisements.

> **Sponsored**
> **ja** JustAnswer
> https://www.justanswer.com › veterinarians › helpline ⋮
> **24 Hour Online Vet Chat - 24-Hour Vet Chat - Solve Vet Problems**
> Discuss Your Animals Symptoms And Receive Home Treatment Options. **Chat** 1-on-1 Right Away.
> Certified Vet Answers · Ask on JustAnswer Now · Get Help for Problems · Collapsed Pets
>
> **Sponsored**
> **AV** Ask A Veterinarian Online
> https://www.askaveterinarianonline.com › dog › veterinary ⋮
> **Ask a Dog Vet Online**
> No Waiting Room, Visit 1:1 Now — Questions Answered Every 9 Seconds. Get Online Vet Answers & Save Time!
> Urgent Care - Online 24/7 · Get poison control info · Verified Dog Vets · 24-Hour Cat Vets

*Figure A. JustAnswer Sponsored Google Ads (March 2025)*

COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF
Case No. 3:26-cv-00333-JD



*Figure B. JustAnswer Sponsored Google Ad (March 2025)*

### 2.    Landing Pages

24.    JustAnswer's search ads link to specialized landing pages promoting JustAnswer's Expert services within a specific category of information related to the consumer's search.  These JustAnswer landing pages can be accessed at a website address such as www.justanswer.com/sip/veterinary or www.justanswer.com/sip/cars, or through a specialized domain such as www.askaveterinarianonline.com/lp.

25.    Since at least January 1, 2022, consumers who click on one of JustAnswer's search ad landing pages using a desktop computer will see a webpage similar to Figure C below.



*Figure C. Screenshot of JustAnswer Landing Page (desktop) (March 2025)*

26.    As shown in Figure C above, the left side of the desktop landing page shows a large image relevant to the specific Expert category (here, the veterinary category), with text superimposed over the image.  The right-hand side of the screen shows a chat box, where JustAnswer's chatbot gathers basic information about the consumer's question.  The chatbot is described as an "assistant" to the Expert (for example, a "Veterinarian's Assistant" in Figures C above and D below) and is typically referred to as "Pearl."  JustAnswer requires that consumers interact with Pearl in order to use JustAnswer's question-and-answer service.  The chat box remains on the right side of the screen even if the consumer scrolls down the page.

27.    When a consumer first accesses the mobile version of JustAnswer's search ad landing page, the entirety of the screen is filled with the chat box, as shown in Figure D below.



*Figure D. Screenshot of JustAnswer Landing Page (mobile) (August 2025)*

28.    When a consumer reaches the landing page, Pearl prompts them to share information about their question or concern.

29.    Since at least January 1, 2022, after soliciting basic information from the consumer, on both the desktop and mobile versions of the landing page, Pearl tells the consumer that they will be sent to a form where they can join JustAnswer's question-and-answer service for either $1 or $5, depending on the cost of the join fee at the time.  For example, as seen in Figure E below, Pearl states, "OK, got it. Here's a secure form to join JustAnswer for $5 (fully-refundable). While you're filling this out, I'll tell the Veterinarian about your situation and then connect you two."



*Figure E. Screenshot of JustAnswer Landing Page (desktop) (March 2025)*

30.    Based on Pearl's representation, a reasonable consumer at this step in the purchase flow would be under the false impression that they would be able to use the JustAnswer service and receive an answer to their question from an Expert for $1 or $5.  In reality, consumers cannot join JustAnswer's question-and-answer service for $1 or $5.  JustAnswer charges consumers both the $1 or $5 join fee *and* a significantly higher monthly subscription fee immediately at sign-up.  JustAnswer will continue charging consumers the recurring subscription fee every month until they cancel.

31. The cost of the monthly subscription fee has varied depending on the Expert category advertised in the purchase flow. For example, in October 2024, JustAnswer charged a $47 subscription fee for the mechanics category and a $79 subscription fee for the legal category. Regardless of the monthly subscription fee JustAnswer charged, JustAnswer permitted consumers to ask questions of Experts from any category. As of at least November 2025, JustAnswer claims to charge new customers a monthly subscription fee of $65 for each Expert category.

32. At times since January 1, 2022, JustAnswer has referred to the monthly subscription fee on the landing page, as shown in Attachment G. On these iterations of the landing page, however, JustAnswer has placed the fee information halfway down the page, where consumers are unlikely to see it.

33. Consumers do not have to scroll down to interact with the Pearl chatbot or to make a purchase. As a result, most consumers who reach JustAnswer's search ad landing page do not scroll down. In fact, JustAnswer knows from data it collects about consumer scrolling behavior that less than half of consumers who sign up for JustAnswer's service scroll *at all* on the landing pages, and less than 10% scroll all the way to the bottom.

34. As of at least mid-2024, JustAnswer removed even this information about the subscription fee, which consumers were unlikely to see, from landing pages that most consumers visit.

### 3. Payment Form

35. On desktop versions of JustAnswer's websites, after Pearl's final message, a credit card payment form appears on the screen. *See* Fig. F below.

//

COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF
Case No. 3:26-cv-00333-JD

-10-



*Figure F. Screenshot of JustAnswer Payment Form (desktop) (March 2025)*

36.    As seen in Figure F above, JustAnswer leaves Pearl's final message—which includes the false claim that the consumer can "join JustAnswer for $5 (fully-refundable)"—visible to the right as consumers enter their email address and payment info.  Below the form is a large, brightly colored button labeled "Confirm now."

37.    Between the form and the "Confirm now" button is a block of text that reads:

> By clicking "Confirm now" I agree to the Terms of Service, Privacy Policy, to be charged the one-time join fee, and a **$39 monthly** membership fee today and each month until I cancel. I can cancel via My Account to avoid future charges. Transactions may be processed by a third party.

38.    JustAnswer includes this language in substantially smaller print than almost any other text on the page—including the "join JustAnswer for $5" claim in the Pearl chat.  While the monthly subscription fee is bolded, it is still difficult to see in comparison to the much larger text throughout the credit card payment form.  Consumers are therefore unlikely to notice the small print.  And for the consumers who do notice, they are unlikely to understand the disclosure

**COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF**
Case No. 3:26-cv-00333-JD

language because it flatly contradicts the prominent express representation that they can join for $5.

39. The payment form on mobile devices populates directly below the Pearl chat, rather than to the left of the chat, as shown in Figure G below. The mobile page scrolls automatically so the payment form appears below Pearl's final message. The block of text between the credit card fields and the large red "Confirm now" button reads similarly to the desktop version. Since at least mid-2024, this fine-print disclosure typically includes the only fee information on the page.



*Figure G. Screenshot of JustAnswer Payment Form (mobile) (August 2025)*

40.    The "Terms of Service" page linked in the block of text on both desktop and mobile versions includes information about JustAnswer's pricing and membership, but consumers are not required to click the link to complete the sign-up process.  Even if a consumer did click the "Terms of Service" link, the terms are dense and lengthy.  The consumer would have to scroll nearly halfway down the Terms of Service page to locate information about subscription fees.

41.    JustAnswer's payment form has changed since January 1, 2022.  *See* Attachments B, D, F, H, J.  For example, as shown in Attachment J, one prior iteration of the payment form (in use as of June 2022) included a checkbox next to a block of text in small print that referred to a "membership" and "charges" but did not include the subscription fee.  The checkbox was pre-checked, so consumers did not have to click it to continue with their sign-up.

42.    Another iteration of the payment form (in use beginning in approximately late 2022) has included the monthly fee disclosure in a subheading above the credit card fields, as shown in Attachment H.  By approximately mid-2024, JustAnswer had moved the monthly subscription fee to the fine print disclaimer above the "Confirm now" button across most of its payment forms in the search ad purchase flow, as shown in Figures F and G above.  *See also* Attachments B, D, F.

43.    Because JustAnswer represents to consumers that they can join JustAnswer's question-and-answer service for $1 or $5, without clearly and conspicuously disclosing that they will be (a) enrolled in a recurring monthly subscription; and (b) charged the initial monthly fee (ranging from $28 to $125 per month) at the same time as the join fee, JustAnswer has misled hundreds of thousands of consumers through its sign-up process.

**B. JustAnswer Has Generated a Massive Volume of Consumer Complaints and Payment Disputes**

44.    Many consumers have reported that they joined JustAnswer believing that their question would be answered for just $1 or $5.  The vast majority of consumers who sign up to use the JustAnswer service ask only one question, and many have complained that they did not know that JustAnswer was enrolling them in a recurring monthly subscription.

45. Many consumers also have complained that they did not know they would be charged for the first month of membership at the time of sign-up.

46. In addition, many consumers have filed disputes with their banks or credit card companies related to the recurring subscription charges.

> **1. Hundreds of Thousands of Consumers Have Complained to JustAnswer That They Thought They Were Going to Pay Only $1 or $5 to Get Their Question Answered**

47. JustAnswer receives complaints directly from consumers by phone and email and through chats with Pearl. Consumers also post complaints on third-party review sites and file complaints with the Better Business Bureau.

48. Many consumers complaining to JustAnswer have expressed confusion because they thought they were paying only the join fee to get one question answered, but later saw the recurring charges on their credit card account. For example:

a. One consumer wrote to JustAnswer in June 2023, "Hello, please refund my $35 back for a membership fee. I do not need a membership, I though[t] I was . . . purchasing a one time only thing for $5. So I cancelled my membership already and just would like to be refunded." JustAnswer does not appear to have provided a refund.

b. In July 2023, a consumer posted on their conversation with their Expert, requesting a refund because of membership confusion. The customer service agent cancelled their membership but did not refund their payment. The consumer responded, "Unfortunately I did not realize that the[re] would be a fee on top of the $5 . . . I had no idea[.] I never signed up for anything and the way I read it was it was a one-time $5 fee [and] if you wanted to use the service again you had to sign up for membership." The consumer expressed that he was a senior on a fixed income and the additional $46 charge beyond the $5 he was expecting was a substantial burden.

49.    Other consumers have explicitly criticized JustAnswer's pricing practices and expressed the view that the company had scammed them.  For example:

a.    In June 2023, a consumer wrote to JustAnswer and requested a refund. After their request was denied, they responded:  "The tab your customers click specifi[es] 5 dollars. You are knowingly tricking people. After I put in my CC info is when I got the total. Please do the right thing and refund the $65. I will not use the service for the rest of the month so it should validate your reimbursement to me. I'm kindly asking you to do the right thing. If you check time stamps, I immediately went and canceled."  JustAnswer does not appear to have provided a refund.

b.    Another consumer wrote to JustAnswer in August 2023, after their refund request was denied:  "[H]ow [is it] I'm . . . not eligible for a refund[?] I made the refund request minutes after I made the payment and I did not know that it was 46 dollars[.] [A]ll I saw and all I agreed on was the 5 dollars[.] [T]his is a straight scam and I'm hoping that I get my money back[.] I did not chat with anyone no one helped me[.] [E]ven if someone texted me or sent me anything it is not worth 51 dollars[.] GET ME MY MONEY BACK."  JustAnswer ultimately refunded the consumer's payment after repeated requests.

50.    Between February 1, 2020, and July 19, 2024, JustAnswer received 679,035 complaints that its own customer service agents specifically tagged in JustAnswer's customer relationship management database as "unaware of recurring membership."  JustAnswer customer service agents tag complaints as "unaware of recurring membership" when the consumer complains that they (1) were "unaware of the ongoing charges associated with their account"; (2) "thought they were paying only one time for one question"; or (3) had "no knowledge of or engagement in any recurring membership with JustAnswer."

51.    The 679,035 consumer complaint figure does not include additional complaints that JustAnswer tagged only as "unsure about the costs of membership."  According to JustAnswer's guidance for customer service representatives, they should mark complaints with

the "unsure" tag when consumers report, for example, that they "didn't authorize $66 to be taken out of my account, I saw only the $2," or that they are "wondering why [they] paid $5 to get an answer from a vet and the card [was] charged for $35 extra dollar[s]," or that they "wanted to request a refund, [they were] under the impression it was only $5."

52.    The categories of complaints described in Paragraphs 50 and 51 represent a significant portion of all consumer contacts with the company.  In late 2022, for example, JustAnswer's customer service supervisors found that complaints about "payment confusion" comprised approximately 25% of all customer service contacts received by the company. JustAnswer described "payment confusion" to include consumers who (1) thought they were only paying for one question, (2) thought they were only paying $1, or (3) didn't realize they had enrolled in a membership.

53.    Similarly, in July 2022, a JustAnswer customer service supervisor wrote to a subordinate, "we know that because the majority of our complaints are related to membership charge confusion that our current sign up flow is misleading."

54.    In August 2022, an employee assigned to work on the purchase flow wrote to a teammate, "like seriously wtf [*sic*] are we doing with this silly $1 thing. customers' [*sic*] feedback is that they feel scammed."

55.    In October 2022, a JustAnswer product manager asked another employee about the five biggest cost drivers to their customer service department.  After soliciting input from a customer service manager, the employee described one of the five biggest cost drivers as: "At the time of sign up, customers are not clearly made aware of the membership details and charges, which causes a large % of customers to reach out for cancellations. This can be easily avoided to reduce [Customer Service] tickets and cost."

56.    Some consumers have escalated their complaints about payment confusion to Kurtzig by emailing him directly.  Kurtzig has forwarded those complaints to customer service personnel to handle.

## 2.     *Consumers Have Requested Refunds from JustAnswer and Disputed Charges at a High Rate*

57.     Consumers have frequently sought a refund from JustAnswer after realizing JustAnswer had enrolled them in a monthly subscription when they joined.

58.     JustAnswer generally refuses to refund subscription fees when a consumer complains that they did not know they were signing up for a subscription, unless the consumer threatens to pursue legal action, file bank or credit card disputes, or leave a bad review on a third-party review site.

59.     Consumers often have sought a refund by disputing the charge with their credit cards or banks.  In many of these instances, consumers have disputed a charge from JustAnswer without first submitting a complaint to JustAnswer.

60.     In 2023, JustAnswer employees created an internal presentation that summarized data from 2022 about refund requests and payment disputes from consumers ("Refunds & Disputes Presentation").  The Refunds & Disputes Presentation was shared with JustAnswer's executive team, including Kurtzig.

61.     According to the Refunds & Disputes Presentation, approximately 238,000 consumers—more than 8% of all active JustAnswer users in 2022—contacted their credit card company to dispute a charge from JustAnswer.  More than 115,000 of these consumers told their credit card companies that the charge from JustAnswer was fraudulent.

62.     The Refunds & Disputes Presentation also notes that when consumers requested a refund from JustAnswer, JustAnswer employees categorized the reason for the refund request. The most common reason was called "Payment Confusion."  Examples of "Payment Confusion" included consumers who "[d]idn't realize they were signing up for a monthly membership" and "[t]hought cost was only $1/$5."

63.     According to the Refund & Dispute Presentation, in 2022, JustAnswer issued $7.9 million in refunds to more than 90,000 consumers whose refund requests were categorized as "Payment Confusion."  The presentation also noted that "50% of Payment Confusion requests are declined by [JustAnswer customer service] agents."

64. JustAnswer has paid millions of dollars for chargeback mitigation services to challenge credit card disputes from consumers.

65. JustAnswer has also used the rapid dispute resolution services ("RDR") offered by Visa and Mastercard to reduce its chargeback rate. RDR prevents chargebacks by automatically providing a refund when consumers contact their credit card company to dispute a charge. According to data from the Refund & Disputes Presentation, in 2022, JustAnswer used RDR to refund 76% of disputes that would have ended up as chargebacks. The presentation claimed that using RDR had kept JustAnswer out of the enforcement programs that credit card networks impose on merchants with high chargeback levels. These programs involve additional monitoring requirements and, in some cases, financial penalties and account termination.

## C. Defendants Know that JustAnswer's Purchase Flow Misleads Consumers but Have Refused to Change the Purchase Flow to Prevent Consumer Injury

66. JustAnswer and Kurtzig are aware that the company's $1 or $5 join fee representation is misleading consumers, and that JustAnswer's disclosures about the subscription do not correct this misleading representation or adequately disclose JustAnswer's pricing and subscription terms. In addition to receiving significant numbers of consumer complaints, as described above, JustAnswer has conducted website testing and marketing research showing that JustAnswer misleads consumers with its purchase flow. Kurtzig directly participated in these efforts.

67. Despite their knowledge of rampant consumer deception, however, JustAnswer and Kurtzig have chosen not to change the JustAnswer purchase flow to prevent this deception or the resulting consumer injury. In fact, over time, JustAnswer has made the purchase flow more deceptive by reducing the amount of information in the purchase flow about its pricing and subscription terms.

### 1. JustAnswer's Website Testing and Marketing Research Show That JustAnswer Misleads Consumers with Its Purchase Flow

68. JustAnswer has frequently tested the effectiveness of the purchase flow described in Section B above by adding or subtracting specific text or images to specific webpages and

then evaluating the numbers of consumers who signed up for the service via each version of the purchase flow. This is often referred to as A/B testing.

69.    Most of JustAnswer's A/B testing has focused on changes to the landing page or payment page that do not affect the pricing or subscription information, such as altering the language of the bullets above the fold on the landing page or changing the background photographs. For example, JustAnswer has tested using personalized headings on the payment form, comparing a generic control version ("Get your answer in minutes") to a heading more tuned to the consumer's question ("Fix your laptop's power issue now").

70.    JustAnswer has also run some A/B tests that focused on its disclosures. In a 2021 A/B test, for example, JustAnswer tested two new versions of the purchase flow. In one version, Pearl's final message included the following sentence: "I'm sending you to a secure page to join JustAnswer for only $1 plus a monthly plan." JustAnswer did not include the "plus a monthly plan" language in the other test version. JustAnswer found that including "plus a monthly plan" significantly decreased the number of consumers who signed up for JustAnswer's service.

71.    In 2021, JustAnswer also conducted one-on-one interviews with consumers about the test versions of the purchase flow with and without the "plus a monthly plan" text. The researchers found that when consumers saw that they would join "for only $1 plus a monthly plan," a majority "recognized it involved *immediate membership* sign-up" (emphasis in original). The researchers noted that without the "and a monthly plan" language, JustAnswer's pricing structure "was less understood as immediate, all-at-once paid membership sign-up." The researchers suggested that there were "opportunities to refine how we explain pricing," namely "Clarify '$1 join fee'" and "Ensure concurrence of initial charges is understood."

72.    The results of both the A/B website tests and qualitative tests relating to the "plus a monthly plan" text in the purchase flow were reported to JustAnswer executives, including Kurtzig. Despite the concerns raised by these tests, JustAnswer and Kurtzig chose to move forward with the version of the purchase flow that did not include "plus a monthly plan" because the phrase caused significantly fewer consumers to sign up for JustAnswer's service.

COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF
Case No. 3:26-cv-00333-JD

73.    In or around late 2022 and early 2023, JustAnswer conducted a survey of past customers to determine their familiarity with the company.  For the survey respondents who recalled being a JustAnswer customer, almost two-thirds responded negatively, with responses "[c]entered on price transparency and amount, and answer quality."  Among other things, past customers described the company in the following ways:

a.    "Appears to be a rip-off."

b.    "A scam."

c.    "Very tricky ads, before you know it you are charged a good amount unless you read the small print."

d.    "Decent source. However, it is not clear that paying to get a specific answer also commits me to a recurring monthly charge whether I use the service or not. Once I noticed the charge I was allowed to cancel the subscription. However, there was no possibility of a refund for the paid but unused months. I will NEVER use Just Answer again."

The survey results were reported to JustAnswer executives, including Kurtzig, in a February 2023 presentation.

74.    In September 2022, JustAnswer analyzed how cancelled customers described their experience with the company's question-and-answer service.  JustAnswer employees concluded that "[p]ayment issues are the biggest cause of dissatisfaction with customers who cancelled recently."  The employees found that the "key issues" related to payments were: "Lack of clarity in fees; Charge after the initial $1; [Customer Service] not being able to help with charge backs."

75.    Defendants have also sought feedback from JustAnswer employees about the purchase flow and price representations.  These employees have flagged that JustAnswer's purchase flow is misleading and that consumers, who may be acting in emergency or high-stress situations and are focused on getting their question answered quickly, may not see the monthly subscription fee information.  For example, in July 2022, at Kurtzig's request, JustAnswer asked employees in the customer service department to provide feedback on the purchase flow.  As part

of this exercise, a customer service supervisor walked through JustAnswer's purchase flow from the perspective of a consumer. She reported that the Pearl message offering the $1 join fee but including "nothing about a membership charge" "leads to a lot of confusion with our customers." She further noted that the membership charge on the payment form was "small enough to be missed" because consumers assume "that they were already educated about the total cost of the interaction." Feedback from this employee walk-through was shared with Kurtzig, but JustAnswer did not make any changes to the purchase flow to address the concerns raised by the customer service supervisor.

### 2. Defendants Have Consistently Refused to Improve the Purchase Flow to Prevent Consumer Deception and Injury

76. JustAnswer has made iterative changes to its purchase flow since it first began charging consumers the monthly subscription fee immediately at sign-up, but none have resolved the company's deceptive practices.

77. On the contrary, JustAnswer has made changes to its purchase flow that make it more likely to mislead consumers. For example, as noted above, some past versions of the landing pages included a reference to a monthly fee, which JustAnswer placed far down the page, where it knew, based on data it collects, that consumers were less likely to see it. As of at least mid-2024, JustAnswer removed even this information about the subscription fee from the landing pages most consumers visit.

78. Similarly, as noted above, in approximately mid-2024, JustAnswer further concealed information about the monthly subscription fee on the payment forms most consumers visit. Previously, the payment form included a subheading that read, "Unlimited conversations—one-time $[X] join fee and **$[X]/month**. Cancel anytime." *See* Fig. H below (red arrow added to indicate the disclosure language). In the revised version, JustAnswer removed this subheading and moved the sole reference to the monthly subscription fee to the fine print below the credit card fields. *See* Fig. I below.

//



*Figure H. Screenshot of JustAnswer*
*Payment Form (October 2022)*

*Figure I. Screenshot of JustAnswer*
*Payment Form (March 2025)*

79.     Even when JustAnswer has included subscription fee information on the landing page, or in larger print on the payment form, consumers have complained to the company in consistently high numbers that they did not know that JustAnswer would enroll them in a subscription.  The complaints show that JustAnswer's disclosures have not been sufficiently clear and conspicuous, especially in light of JustAnswer's contradictory claim that consumers can "join JustAnswer" for $1 or $5.

80.     Kurtzig and JustAnswer know that the company is deceiving consumers, yet have refused to make changes to comply with the law.

81.     Kurtzig and JustAnswer have significant experience with negative option marketing and are aware of the laws that apply to this form of marketing, such as the FTC Act and ROSCA.  Under Kurtzig's control and with his direct participation, JustAnswer has engaged in negative option marketing for twenty-one years.  The company has extensive legal resources, including in-house and outside counsel with expertise in the FTC Act and ROSCA.  Kurtzig and JustAnswer were aware of significant government scrutiny into the company's subscription enrollment and pricing practices, including a Civil Investigative Demand issued to JustAnswer in February 2023 seeking documents and information pertaining to, among other things, potential

violations of the FTC Act and ROSCA.  Nevertheless, JustAnswer continues to make the false claim that consumers can join JustAnswer's question-and-answer service for $1 or $5 and omit clear and conspicuous disclosures about the monthly subscription fee and the recurring subscription commitment.

82.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATION OF THE FTC ACT

83.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

84.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

**Misrepresentation That Consumers Can Join JustAnswer's Question-and-Answer Service by Paying a Nominal One-Time Fee**

85.    In numerous instances in connection with the advertising, marketing, promotion, or offering for sale of its online question-and-answer service, as described in Paragraphs 20 to 81 above, Defendants represent, directly or indirectly, expressly or by implication, that consumers can join JustAnswer's question-and-answer service and have their question answered by paying a nominal one-time fee, such as $1 or $5.

86.    In fact, consumers cannot join JustAnswer's question-and-answer service and have their question answered by paying a nominal one-time fee.  Consumers must pay both the one-time "join" fee and a subscription fee that has ranged between $28 and $125 before they can use JustAnswer's service.

87.    Therefore, Defendants' representation as described in Paragraph 85 is false or misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

88.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401–8405, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

89.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges.  *See* 15 U.S.C. § 8403.

90.     The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

91.     Defendants have sold a subscription service, in transactions effected on the internet, through a negative option feature as defined by the TSR, 16 C.F.R. § 310.2(w).

92.     Pursuant to Section 5(a) of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA shall be treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore a violation of ROSCA constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

//

COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF
Case No. 3:26-cv-00333-JD

-24-

## COUNT II

### Failure to Clearly and Conspicuously Disclose Material Terms

93.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 20 to 81 above, Defendants failed to clearly and conspicuously disclose all material terms of the transaction, including the price of using the JustAnswer question-and-answer service, its auto-renewal provision, and the timing of the first subscription fee, before obtaining the consumer's billing information.

94.    Accordingly, consumers joined JustAnswer's question-and-answer service without knowing that JustAnswer would enroll them in a costly recurring subscription.

95.    Defendants' acts or practices as set forth above are violations of Section 4(1) of ROSCA, 15 U.S.C. § 8403(1), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Failure to Obtain Express Informed Consent

96.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 20 to 81 above, Defendants failed to obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction.

97.    Defendants' acts or practices as set forth above are violations of Section 4(2) of ROSCA, 15 U.S.C. § 8403(2), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

98.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and ROSCA.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## CIVIL PENALTIES

99.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award civil penalties for each violation of ROSCA.

100.    Defendants violated ROSCA with actual knowledge or knowledge fairly implied on the basis of objective circumstances, as required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA by Defendants;

B.    Award monetary and other relief within the Court's power to grant;

C.    Impose civil penalties on Defendants for each violation of ROSCA; and

D.    Award any additional relief as the Court determines to be just and proper.

Dated: January 13, 2026                    Respectfully submitted,


                                           /s/ *Samantha Bennett*
                                           SAMANTHA BENNETT
                                           NY Bar No. 5132063
                                           EVAN ROSE
                                           Cal. Bar No. 253478
                                           ALYSSA J. WU
                                           Cal. Bar No. 339651
                                           Attorneys
                                           Federal Trade Commission
                                           Western Region San Francisco
                                           90 Seventh St., Suite 14-300
                                           San Francisco, CA 94103
                                           Phone: (415) 848-5100
                                           Email: sbennett@ftc.gov, erose@ftc.gov,
                                           awu1@ftc.gov

                                           Attorneys for Plaintiff
                                           FEDERAL TRADE COMMISSION

COMPLAINT FOR PERM. INJUNCTION, MONETARY JUDGMENT, CIV. PENALTY JUDGMENT & OTHER RELIEF
Case No. 3:26-cv-00333-JD

# ATTACHMENT A

**ATTACHMENT A**

JustAnswer Veterinary Category Landing Page
(Mobile version with scrolling – August 2025)




















Source: FTC web capture

6

# ATTACHMENT B

7

**ATTACHMENT B**

JustAnswer Veterinary Category Payment Form
(Mobile version, following landing page depicted in Attachment A – August 2025)



Source: FTC web capture

8

# ATTACHMENT C

9

**ATTACHMENT C**

JustAnswer Veterinary Category Landing Page
(Desktop version with scrolling – March 2025)

















Source: FTC web capture

# ATTACHMENT D

**ATTACHMENT D**

JustAnswer Veterinary Category Payment Form
(Desktop version, following landing page depicted in Attachment C – March 2025)



Source: FTC web capture

# ATTACHMENT E

**ATTACHMENT E**

JustAnswer Veterinary Category Landing Page
(Desktop version with scrolling – December 2024)





17











Source: FTC web capture

# ATTACHMENT F

**ATTACHMENT F**

JustAnswer Veterinary Category Payment Form
(Desktop version, following landing page depicted in Attachment E – December 2024)





Source: FTC web capture

22

# ATTACHMENT G

**ATTACHMENT G**

JustAnswer Veterinary Category Landing Page
(Desktop version with scrolling – January 2023)





24











Source: JustAnswer Veterinary Landing Page, Internet Archive, archived January 10, 2023, *available at* https://web.archive.org/web/20230110192319/https://www.justanswer.com/sip/veterinary/ (last accessed Sept. 8, 2025)

# ATTACHMENT H

**ATTACHMENT H**

JustAnswer Payment Form
(Desktop version – October 2022)



Source: JustAnswer

# ATTACHMENT I

**ATTACHMENT I**

JustAnswer Landing Page
(Desktop version with scrolling – June 2022)















Source: FTC web capture

# ATTACHMENT J

**ATTACHMENT J**

JustAnswer Appliance Category Payment Form
(Desktop version, following landing page depicted in Attachment I – June 2022)



Source: FTC web capture

35